IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COLIN MATHEWS. | § | NO. 1:23-CV-756-DAE |
| | § | |
| Mathews, | § | |
| | § | |
| vs. | § | |
| | § | |
| MAILSHAKE, LLC, ROBERT | § | |
| SENOFF, and SUJAN PATEL, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants' Mailshake, LLC ("Mailshake"), Robert Senoff, and Sujan Patel's Motion to Dismiss Plaintiff Colin Mathews's Second Amended Complaint.  (Dkt. # 6.)  The Court finds this matter suitable for disposition without a hearing.  After careful consideration of the memoranda filed in support of and in opposition to the motion and the relevant law, the Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART** the Motion.

1

<u>BACKGROUND</u>

Defendant Mailshake is a software company, offering to increase a client's "reply rate" to the client's marketing emails by ensuring the emails are not flagged as spam.  (Dkt. # 1 at 3.)  Plaintiff Colin Mathews alleges, in 2016, he worked with Defendant Sujan Patel to create the software that makes up the Mailshake's sales engagement and automation software.  (<u>Id.</u>)  At the time, the software was developed by and through Bang Bang LLC, but was incorporated as Mailshake in 2018.  (<u>Id.</u>)

Mathews alleges that Patel wanted to bring on Defendant Robert Senoff as an owner of Mailshake.  (<u>Id.</u>)  In January 2017, Mathews agreed to bring in Senoff as a 1/3 owner, with Senoff contributing $10,000 to the company.  (<u>Id.</u>)  Mathews alleges that from 2017 to 2019, Mailshake continued to grow in revenue. (<u>Id.</u>)

Mathews alleges that a fundamental dispute began to exist between himself, and Senoff and Patel.  (<u>Id.</u>) The dispute allegedly centered around the amount of distributions they could take from the company.  (<u>Id.</u>)

Around September 2021, Mathews alleges that Mathews, Senoff, and Patel agreed to explore the possibility of selling the company.  (<u>Id.</u>)  Mathews claims that Senoff and Patel never presented Mathews with buyers or offers.  (<u>Id.</u> at 5.)

2

In February 2022, Patel and Senoff approached Mathews about the possibility of buying Mathew's interest in Mailshake.  (Id.)  On March 22, 2022, Mathews and Mailshake entered into a Separation and Unit Repurchase Agreement ("Repurchase Agreement"), whereby Mailshake repurchased Colin's 693,000 units.  (Id., Ex. 1.)  Patel and Senoff were not parties to the Repurchase Agreement. (Id. at 5.)  After the Repurchase Agreement, Patel and Senoff's ownership in Mailshake increased from 32.92% to 46.54% each, with a small percentage of equity pledged to employee options.  (Id. at 5.)

The Repurchase Agreement stated that Mathews was to be paid "Exit Consideration" upon the "Sale of the Company."  (Id., Ex. 1 at 6.)  The Repurchase Agreement provided for payments if the Sale of the Company had not occurred before the first anniversary of the agreement date (the "Second Tranche" payment). (Id.)  The Repurchase Agreement also provided for "Sale Delay Payments" if the Sale of the Company had not occurred before the fourth anniversary of the Agreement Date and "each subsequent anniversary of the Agreement Date until the earlier of (1) the occurrence of a Sale of the Company and (2) such time at which the aggregate amount of Prior Payments equals the Consideration Cap."  (Id.) Under no circumstances "may the aggregate payments and distributions made to" Mathews under the Repurchase Agreement "exceed the Consideration Cap."  (Id.) (Id.)  The Consideration Cap was $3,500,000.  (Id. at 4.)

The following representation was made in the Repurchase Agreement: "WHEREAS, the Company has advised the Member that the Company and its other primary members (i.e., Sujan Patel and Robert Senoff) desire to cause a Sale of the Company (as defined below) to occur within four years after the Agreement Date." (Dkt. # 1, Ex. 1 at 1.)

Mathews contends that it was the parties' intent that the sale of the company would be "at its fair market value through an arm's length transaction." (Id. at 5.) He alleges this representation was material to his ultimate agreement to sell his interest to Mailshake.

A "Sale of the Company" is defined in the Repurchase Agreement as follows:

(i)     "*Sale of the Company*" means the consummation of any of the following transactions, in any form or combination of forms, pursuant to which assets or securities of the Company are acquired for consideration paid in cash, securities or other property:

(i)     a sale, transfer or other disposition of all or substantially all of the Company's assets, including the sale or exclusive license of all or substantially all of the Company's intellectual property;

(ii)     a merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of securities of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the then-outstanding securities of the Company or the surviving or resulting entity); or

(iii)     an acquisition (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, by a person or group of affiliated persons, of securities of the Company constituting a majority of the aggregate voting power of the then-outstanding securities of the Company (disregarding any securities of the Company owned by such person or group of affiliated persons immediately prior to such acquisition).

For the absence of doubt, only the consummation of the first of the foregoing transactions after the Agreement Date shall constitute a Sale of the Company.

(Dkt. # 1, Ex. 1 at 5.)

4

Approaching the first anniversary of the Agreement date in February 2023, Mathews alleges that Patel reached out to Mathews to see if he would want to "restructure" the Repurchase Amount.  (Dkt. # 1 at 8.)  Mathews allegedly stated that he was disinclined to renegotiate but that he was willing to discuss Defendants' proposals.  (Id.)

On March 20, 2023, Defendants told Mathews that a Sale of the Company had occurred prior to the first anniversary of the Agreement Date (which would have been March 22, 2023).  (Id. at 8.)   Defendants calculated the Exit Consideration payable to Mathews to be negative.  (Id. at 9.)  When asked who the sale was made to, Defendants did not provide the identity to Mathews.  (Id.)

Months before the sale, on December 2, 2022, Mathews alleges that Patel informed him that Mailshake had around $700,000 in the bank to pay Mathews.  (Id.)  Weeks before the sale, Mathews alleges that Patel informed him that Mailshake was worth approximately $6 million.  (Id. at 9.)  Mathews contends that Defendants represented that the "buyer" purchased Mailshake units for only $364,300.76.  (Id.)

 Mathews alleges that Patel and Senoff, or their "affiliates," were the buyers, each depositing $182,150.38 into Mailshake's bank account for half of the sales price.  (Id. at 10.)

On July 5, 2023, Mathews filed suit alleging breach of contract against Mailshake, unjust enrichment against Patel and Senoff, actual fraudulent transfer and constructive fraudulent transfer fraudulent inducement, constructive fraud, breach of fiduciary duty, and breach of duty of good faith against all Defendants.  (Dkt. # 1.)  Defendants filed a Motion to Dismiss on September 5, 2023.  (Dkt. # 6.)  The case was reassigned to the undersigned on September 21, 2023.  (Dkt. # 8.)  Mathews filed a Response on October 3, 2023.  (Dkt. # 9.) Defendants filed a Reply on October 13, 2023.  (Dkt. # 11.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a claim for "failure to state a claim upon which relief can be granted."  In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

DISCUSSION

Defendants ask the Court to dismiss all of Mathew's claims because Mathews fails to state a viable claim for relief under Rule 12(b)(6).  (Dkt. # 6 at 1.)

Defendants ask this Court to dismiss all eight causes of action asserted against them.  The Court will address each in turn.

I.    Breach of Contract against Mailshake

Under Texas law, a claim for breach of contract requires the plaintiff to show "(1) a valid contract, (2) performance by the plaintiff as contractually required, (3) breach by the defendant, and (4) damages due to the breach." Harrison Co., L.L.C. v. A-Z Wholesalers, Inc., 44 F.4th 342, 346 (5th Cir. 2022).

Mathews alleges that Mailshake breached the Repurchase Agreement when it (1) failed to pay the Second Tranche payment because there was not a "Sale of the Company" and (2) did not sell Mailshake for fair market value.  (Dkt. # 1 at 10.)  Defendants argue that Mathews fails to state a claim against Mailshake because the Repurchase Agreement did not require Mailshake to sell the company to a third party or at fair market value.  (Dkt. # 6 at 7.)

First, Defendants allege a Sale of the Company occurred. Specifically, Defendants claim that the sale here falls under Section 2.1(i)(iii),

7

which defines a Sale of the Company as "an acquisition (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, by a person or group of affiliated persons, of securities of the Company constituting a majority of the aggregate voting power of the then outstanding securities of the Company (disregarding any securities of the Company owned by such person or group of affiliated persons immediately prior to such acquisition)." (Dkt. # 1, Ex. 1 at 5.)

Mathews argues that the sale of Mailshake to Senoff and Patel was a "Sham Sale" and not a "Sale of the Company" under the express terms of the Repurchase Agreement.  Mathews contends that the reason for the "disregarding the securities already owned by the purchaser" language is unambiguously apparent from the plain language of the contract and the surrounding circumstances.  (Dkt. # 9 at 7.)  The language would not allow a "Sale of the Company" to occur by Senoff and Patel selling their own units to themselves.  (Id., at 8.)  Therefore, because Senoff, Patel, and their related entities were the majority owners before and after the "sale," the sale was a sham and did not constitute a "Sale of the Company" under the Repurchase Agreement.  Under this theory, Mailshake was obligated to pay the Second Tranche payment, the annual payment due to Mathews if no sale occurred, because no Sale of the Company had occurred.

Defendants respond by stating that Mathews's argument is not based on the plain language of the Repurchase Agreement and Mathews may not use extrinsic evidence to render a contractual provision ambiguous.  (Dkt. # 11 at 2.) Essentially, Defendants argue that the contract language is unambiguous and never indicates that the transfer must result in a change of ownership to a third party at fair market value.

In construing a written contract, the Court's primary objective is to ascertain the parties' true intention as expressed in the language they choose. Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc., 473 S.W.3d 296, 306 (Tex. 2015).  Courts should consider "the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless." Id. Words should be given their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a different or technical sense.  Id.

The crux of the issue is whether the definition of a Sale of a Company unambiguously requires there to be an actual change of ownership.  A contract is not ambiguous if the contract's language can be given a certain or definite meaning.  Id.  If the contract is subject to two or more reasonable interpretations *after* applying the construction principles, the contract is ambiguous.  Id.  Mere disagreement over the interpretations of an agreement does not necessarily render

the contract ambiguous.  Id.  If the contract is ambiguous, there is a fact issue

regarding the parties' intent.  Id.

       The Court may use the surrounding circumstances to determine if an

ambiguity exists.  Id.  However, the surrounding circumstances can only act as an

"aid" and "has its limits."  Id.

       Under the plain language of the contract, a Sale of the Company

occurs if the buyer acquires "securities of the Company constituting a majority of

the aggregate voting power of the then outstanding securities of the Company

(disregarding any securities of the Company owned by such person or group of

affiliated persons immediately prior to such acquisition)."  (Dkt. # 1, Ex, 1 at 5.)

Before the alleged Sale, Senoff and Patel each owned 46.54% of the company, or

93.08% and 1,260,000 shares combined.  (See Dkt. # 1 at 4, 5.)  Taking Mathews's

allegations as true, Senoff and Patel, either directly or through an affiliate,

purchased an additional 1,725,726 units from Mailshake.  (Dkt. # 1 at 9.)  Yet

Senoff and Patel's majority ownership in the company remained the same at

around 93%.  There are two possible scenarios under these facts.  First, Senoff and

Patel sold their existing shares back to Mailshake, then Mailshake sold those back

to Senoff and Patel or their affiliates entities.  The second scenario is that

Mailshake issued new shares in the company to Senoff and Patel.  In either of these

scenarios, if one disregarded "any securities of the Company owned by [Senoff and

Patel] immediately prior to such acquisition," Senoff and Patel would not be purchasing a majority of the voting power in the Company, as they were the previous holders of the 93% majority of the shares.  Therefore, these transactions would not be classified as a "Sale of the Company."

Furthermore, this sale was clearly not a result contemplated by the Parties.  We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and avoiding unreasonable constructions when possible and proper.  Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc., 473 S.W.3d 296, 305 (Tex. 2015).  Under the terms of this contract, allowing Patel and Senoff to sell Mailshake to themselves or to their affiliates would defeat the purpose of including information regarding Exit Consideration and a Second Tranche payment.  Essentially, if Senoff and Patel could "sell" the company to themselves for any value, there would be no reason to include contingent plans for payments if Senoff and Patel did not sell the company, as they could simply sell the company to themselves for any price.  An interpretation that is unreasonable, oppressive, or creates an inequity in the relevant context must be avoided.  Frost Nat. Bank v. L & F Dist., Ltd., 165 S.W.3d 310, 311–12 (Tex. 2005).  Here, allowing Senoff and Patel to sell the company to themselves at any value is clearly unreasonable, oppressive, and was not a result contemplated or intended by the Parties.

11

Additionally, the Court should avoid constructions that render any of its provision superfluous.  <u>Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.</u>, 220 F.3d 427, 431 (5th Cir. 2000).  If the buyer could buy shares from itself through an affiliate or issue more shares in the Company to sell the Company to itself, then the phrase "disregarding any securities of the Company owned by such person or group of affiliated persons immediately prior to such acquisition" would be rendered superfluous.

Defendant contends that Patel and Senoff bought the 1,725,726 units from Mailshake, as alleged in the complaint.  Therefore, Patel and Senoff purchased 1,725,726 shares *in addition* to the 1,386,000 units they already owned.  Under this arrangement, Patel and Senoff purchased the majority of shares, even disregarding the 1,386,000 units they already owned.  However, if this were the case, the analysis above still holds, because Mailshake, through Senoff and Patel, would have essentially issued more shares to sell itself to the same beneficial holders.  Senoff and Patel still held the majority of the voting power before and after the sale.

At minimum, the contract is ambiguous as to whether the acquisition by Patel and Senoff constituted a sale.  When a contract is found to be ambiguous, the parties' intent is a determination for the fact finder.  <u>Coker v. Coker</u>, 650 S.W.2d 391, 395 (Tex. 1983).

Because Mathews plausibly alleged that a true "Sale of the Company" did not occur, Mailshake was plausibly obligated to transfer the Second Tranche Payment to Mathews.  By not sending this Second Tranche Payment to Mathews, Mailshake plausibly breached the Repurchase Agreement under the facts pled by Mathews.  Therefore, dismissal under Rule 12(b)(6) is not warranted at this stage because Mathews has plausibly stated a claim for breach of contract.

II.    Fraudulent Transfer against all Defendants

Defendants argue that Mathews failed to plausibly allege a claim for actual fraudulent transfer under TUFTA.  The elements of an actual fraudulent transfer under TUFTA are: (1) Plaintiff is a 'creditor' with a claim against a debtor; (2) the debtor transferred assets after, or a short time before, the Plaintiff's claim arose; and (3) the debtor made the transfer with the intent to hinder, delay, or defraud the Plaintiff.  In re Galaz, 765 F.3d 426, 433 (5th Cir. 2014); Tex. Bus. & Com. Code § 24.005(a)(1)).

The law is unsettled as to whether the Rule 9 pleading standard applies to claims of actual fraudulent transfer.  Matter of Life Partners Holdings, Inc., 926 F.3d 103, 118 (5th Cir. 2019) ("[B]ecause [Plaintiffs'] allegations are sufficient under either standard, we need not weigh in on this vexing question.") The district courts are split, but the majority of courts hold that Rule 9 applies to actual fraudulent transfer claims because the plaintiff must allege there is an

"actual intent to defraud."  See Crownover v. Crownover, No. DR:15-CV-132-AM-CW, 2018 WL 6220149 (W.D. Tex. Mar. 30, 2018) (collecting cases); Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC, 566 B.R. 815 (W.D. Tex. 2017) (applying Rule 9 standard to actual fraudulent transfer claim).  The Court will therefore apply Rule 9 to the actual fraudulent transfer claim.

First, Defendants argue that Mathews fails to plausibly plead that he is a creditor with a claim. Mathews alleges that, because no Sale of the Company occurred, Mailshake owed Mathews the Second Tranche payment of $250,000. (Dkt. # 1, Ex. 1 at 12.)  However, Defendants contend that a Sale of the Company did occur, so the Second Tranche Payment was not due.

Mathews plausibly stated that a Sale of the Company did not occur, as analyzed by the Court in Section I.  Therefore, Mathews plausibly alleges that Defendants owned Mathews the Second Tranche payment as a result and, as a result, Mathews is a "creditor with a claim."

That said, Mathews did not state the second and third elements with particularity.  Mathews alleges that "Defendants transferred assets, including but not limited to [Mathews]'s interest in Mailshake, immediately before [Mathews]'s claim arose." (Dkt. # 1 at 12.)  Mathews does not specify what these "assets" are or

what his "interest" in Mailshake was – as he had no ownership in Mailshake at the date of the alleged fraudulent transfer.

Further, even if Mathews had an undisputed claim for the Second Tranche payment, Mathews does not allege how the claim was "transferred." Mathews alleges that Mailshake was insolvent so it must have transferred away his claim for the Second Tranche Payment.  However, it is unclear how that argument could be true if Mailshake got an infusion of cash from Senoff and Patel on March 20, 2023, as Mathews alleges.  In sum, Mathews did not sufficiently allege that Defendants transferred Mathews's interest in Mailshake. Therefore, Mathews failed to state a plausible claim for actual fraudulent transfer.  However, this dismissal will be without prejudice and Mathews will be given the opportunity to amend.

III.   Constructive Fraudulent Transfer against all Defendants

Mathews additionally alleges that Defendants engaged in a constructive fraudulent transfer.  The Court will not apply the heightened fraudulent pleading standard for a claim of constructive fraudulent transfer because actual intent to defraud is not required. See Crownover v. Crownover, No. DR:15-CV-132-AM-CW, 2018 WL 6220149 (W.D. Tex. Mar. 30, 2018); Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC, 566 B.R. 815 (W.D. Tex. 2017).  However, the constructive fraudulent transfer

15

claim fails for the same reason the actual fraudulent transfer claim fails – Mathews did not sufficiently allege how Mailshake, Patel, or Senoff transferred Mathews's "interest in Mailshake," which presumably did not exist. Mathews argues, contrary to his allegations pertaining to actual fraudulent transfer, that the "transfer of interest" was not the transfer of the value of Second Tranche Payment, but the "transfer of interest in property" that occurred after the "Sham Sale" when "Mailshake did not receive reasonably equivalent value for his Exit Consideration." (Dkt. # 9 at 13.) Essentially, Mathews argues that Defendants transferred away his "property" right to the fair market value of the shares by transferring the shares of Mailshake at an extremely low cost.

A "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." TEX. BUS. & COM. CODE ANN. § 24.002. (emphasis added). An "asset" is defined as "property of the debtor." Id. Therefore, Mathews must plead that he has an interest in the shares of Mailshake, which were transferred.

Under Mathews's new theory, even if Defendants did not sell Mailshake for a fair market value, Mathews does not explain how he had any interest in the shares Mailshake or how his interest in the fair market value of the

16

shares was just transferred.  Instead, Mailshake just sold shares, which Mathews did not own.  As a result, Mathews's constructive fraudulent transfer claim will also be dismissed without prejudice.

IV.    Fraudulent Inducement against all Defendants

Mathews alleges in Count V that all Defendants fraudulently induced him into entering the Repurchase Agreement based on the false promise to sell Mailshake for its fair market value within four years of Mathews's agreement to sell his units.  (Dkt. # 1, Ex. 1 at 14.)  Defendant argues that Mathews failed to plausibly state a fraudulent inducement claim because Defendants' statement that it "desire[d] to cause a Sale of the Company…within four years" could not have been a material representation.

A fraudulent inducement claim is subject to the heightened pleading standard of Rule 9(b).  Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter, 607 F.3d 1029 (5th Cir. 2010).

Fraudulent inducement is a "species of common-law fraud that shares the same basic elements: '(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.'"  Anderson v. Durant, 550 S.W.3d 605, 614 (Tex. 2018).  Plaintiff states a claim for fraudulent inducement when he alleges

that a "false promise of future performance" was made "with a present intent not to perform." Id.

The first issue is whether Defendants made a misrepresentation. A promise may be a misrepresentation when there is a "promise of future performance made with a present intent not to perform." Id. Mathews alleges that Defendants "represented they would sell the company for its fair market value within four years of [Mathews]'s agreement to sell his Units and they would fairly compensate [Mathews] for his equity in Mailshake." (Dkt. # 1 at 14.) Mathews alleges that this "representation was so important that it was memorialized in the Repurchase Agreement." (Id.) Mathews points to the Repurchase Agreement, which states "WHEREAS, the Company has advised the Member that the Company and its other primary members (i.e., Sujan Patel and Robert Senoff) desire to cause a Sale of the Company (as defined below) to occur within four years after the Agreement Date." (Dkt. # 1, Ex. 1 at 2.) These statements would be false if Defendants made the statements with no intent or desire to sell the company and fairly compensate Mathews.

Mathews alleges that Defendants never intended to sell the company and fairly compensate him, but rather, always intended to sell it to themselves. (Dkt. # 1 at 13.) "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). "Intent is a fact question

within the realm of the trier of fact because it is dependent upon the credibility of witnesses and the weight to be given to their testimony." <u>Nwokedi v. Unlimited Restoration Specialists, Inc.</u>, 428 S.W.3d 191, 199 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Therefore, this general allegation, along with the specific allegedly false statements, sufficiently alleges that a misrepresentation with knowledge of its falsity was made by Defendants.

The next issue is whether these misrepresentations were "material." "A false representation is material if a reasonable person would attach importance or and be induced to act on the information." <u>Potter</u>, 607 F.3d at 1033 (5th Cir. 2010). Defendants contend their statement of "desire" to cause a Sale of the Company cannot be a material misrepresentation because it is merely a recital in the contract, does not assert a substantive course of action or even lay out a plan. Therefore, Mathews could not have reasonably attached importance to it. However, Mathews does not solely his claim of fraudulent inducement on the contract, but also the oral representations made by Senoff and Patel during negotiations of the Repurchase Agreement. (<u>See</u> Dkt. # 1 at 5.) Mathews alleges that Senoff and Patel went beyond stating a *desire* to sell Mailshake, but also stated that they intended to sell Mailshake during negotiations. (<u>Id.</u>) Mathews reasonably attached importance to these statements and was induced to enter the

19

Repurchase Agreement based on these representations, allowing Mailshake to repurchase his stocks in exchange for consideration upon the sale of the company.

The last issue the Court must address is whether Mathews's reliance on these statements was "justifiable." Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc., 590 S.W.3d 471, 496–97 (Tex. 2019). Defendants argue that the recitals in the contract are not legally binding, and therefore may not reasonably be relied upon. (Dkt. # 6 at 17.) However, as explained above, Mathews does not solely rely on the recitals for its fraudulent inducement claims, but also the statements made during negotiations. The recitals also do not negate the statements made in the negotiations, because the recitals do not directly contradict Senoff and Patel's statement of intent to sell the company. Cf. LeTourneau Techs. Drilling Sys., Inc. v. Nomac Drilling, LLC, 676 F. Supp. 2d 534 (S.D. Tex. 2009) ("Reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.") In fact, the Repurchase Agreement contemplates and plans for the Sale of the Company, setting up the mechanism to calculate Mathews's Exit Consideration and payment plans for each year the company is not sold. Mathews reasonably attached importance to this promise and negotiated a contract to ensure Mathews's financial benefit when the sale occurred.

20

For these reasons, Mathews states a plausible claim for fraudulent inducement.

V.    Breach of Fiduciary Duty

Mathews brings a breach of fiduciary duty claim against all Defendants.  (Dkt. # 1 at 15.)  Mathews alleges that Defendants owed Mathews a fiduciary duty because Mailshake was insolvent and Mathews was "Mailshake's only creditor."  (Id.)  Defendant argues that no fiduciary duty exists.

The claims against Patel and Senoff fail because directors of a corporation do not have a fiduciary duty to its creditors, even if the corporation is insolvent but still operating.  Conway v. Bonner, 100 F.2d 786, 787 (5th Cir. 1939); Floyd v. Hefner, No. CIV.A. H-03-5693, 2006 WL 2844245, at *11–12 (S.D. Tex. Sept. 29, 2006) (recognizing that Conway is still controlling), on reconsideration in part, 556 F. Supp. 2d 617 (S.D. Tex. 2008); see also Torch Liquidating Tr. ex rel. Bridge Associates L.L.C. v. Stockstill, 561 F.3d 377, 386 (5th Cir. 2009) ("[I]ndividual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors.") (quoting N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92 (Del. 2007)).   Mathews was no longer a shareholder of Mailshake but merely a creditor; therefore, neither Mailshake nor Mailshake's directors owed Mathews a fiduciary duty.

Both Mathews and Defendant contend that an unpublished Fifth Circuit case supports their positions.  (Dkt. # 9 at 20.)  (Dkt. # 11 at 8) (citing Matter of ATP Oil & Gas Corp., 711 Fed. Appx. 216, 221 (5th Cir. 2017). However, even if that case were precedential, the Fifth Circuit stated that "it is well-established that while the corporation continues to operate, officers and directors of Texas corporations owe fiduciary duties to the *corporation*—not the corporation's creditors."  Id. (emphasis added).  Therefore, Patel and Senoff did not owe a fiduciary duty to Mathews.  This claim will be dismissed with prejudice, as it appears the defect is uncurable.  Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

VI.    Breach of Duty of Good Faith and Fair Dealing

Mathews claims that Defendants breached their duty of good faith against Defendants.  Mathews claims that a duty of good faith should be read into the Repurchase Agreement.  (Dkt # 1 at 16.)

Under Texas law, a contract does not automatically include an implied covenant of good faith and fair dealing.  Houle v. Casillas, 594 S.W.3d 524, 544 (Tex. App.—El Paso 2019, no pet.).  In fact, Texas law rejects the application of this covenant in "almost all circumstances."  Hux v. S. Methodist Univ., 819 F.3d 776, 781 (5th Cir. 2016) (citing English v. Fischer, 660 S.W.2d 521, 522 (Tex. 1983).  "But in an extremely narrow class of cases, the Texas courts have

determined that a special relationship may give rise to a tort duty of good faith and fair dealing."  Id.

A "special relationship" arises when there is a formal fiduciary duty, which is absent in this case as explained above.  Id.

However, a special relationship may still arise, even absent a formal fiduciary duty, in "discrete, special relationships, earmarked by specific characteristics including: long standing relations, an imbalance of bargaining power, and significant trust and confidence shared by the parties."  Id. (quoting Caton v. Leach Corp., 896 F.2d 939, 948 (5th Cir.1990)).  The relationship must exist independent of the contract or agreement that forms the basis of the dispute. Transp. Ins. Co. v. Faircloth, 898 S.W.2d 269, 280 (Tex. 1995).

Mathews contends that he has adequately pled the existence of an informal fiduciary relationship.  Mathews alleges that this special relationship arose due to the amount of trust Mathews placed in Patel and Senoff, citing the fact that they have worked together for several years and built a company together. (Dkt. # 9 at 18.)  He alleges that he trusted Senoff and Patel to run a third-party marketing process to find buyers of Mailshake and trusted their reasons for wanting Mathews to leave Mailshake.  (Id. at 18-19.)

Mathews's trust in Defendants alone cannot give rise to an informal fiduciary relationship.  Mere subjective trust does not transform a dealing into a

23

fiduciary relationship.  Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171 (Tex. 1997).  Mathews contends that the Texas Supreme Court held that an informal fiduciary relationship may arise when one partner does not disclose material matters when purchasing another partner's interest in the partnership assets.  (Dkt. # 9 at 17) (citing Tex. Bank & Tr. Co. v. Moore, 595 S.W.2d 502 (Tex. 1980)).  However, Mathews takes a quote out of context to support its argument.  The quote is merely a summary of one party's argument by the Supreme Court, not the holding.  Compare Moore, 595 S.W.2d at 508 ("Johnson by cross action alleged among other things, that Peckham did not disclose material matters when purchasing Johnson's interest in the partnership assets and hence did not act in good faith. The judgment of the trial court was for Johnson[;]") with (Dkt. # 9 at 17) ("The Texas Supreme Court concluded that a fiduciary duty relationship can exist[] and a partner can fail to act in good faith when one partner 'did not disclose material matters when purchasing Johnson's [other partner's] interest in the partnership asserts and hence did not act in good faith.'")

Instead, the Court in Moore held that a fiduciary relationship existed between a woman and her nephew when the nephew accepted transfers from his aunt as a joint tenant with survivorship rights in two of her accounts.  Moore, 595 S.W.2d at 508–09.  Even in Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786 (1938), the case cited in Moore, the Texas Supreme Court held that "a partner

24

selling his interest to another partner has a fiduciary duty requiring full disclosure of all important information about the value of an interest." Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171 (Tex. 1997). Here, Mathews was selling his interest in the partnership back to Mailshake, not the reverse. Therefore, Johnson still does not support finding an informal fiduciary relationship between Mathews and any of the Defendants.

Mathews also cites Navigant Consulting as support for the existence of an informal fiduciary relationship, but the issue of whether an informal fiduciary relationship existed between and employer was not under review. (Dkt. # 9 at 18) (citing Navigant Consulting, Inc. v. Wilkinson, 508 F.3d 277, 283 (5th Cir. 2007)).

Lastly, Mathews cites Bank One, Tex., N.A. v. Stewart, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) to support a finding of an informal fiduciary relationship. Though the Court states that "a confidential relationship exists where influence has been acquired and abused, and confidence has been reposed and betrayed," the Court ultimately found that there was no confidential/informal fiduciary relationship between a lender and a borrower. Id. 442–43. Like the case here, the court relied upon the fact that there was no unequal bargaining power and the fact that the agreement between the parties did not create a fiduciary relationship. Id.

Ultimately, Mathews cites no authority and provides no allegations that support a finding of a special relationship, whether based on a formal or informal fiduciary relationship. Mathews only relies on the allegations that he placed a large amount of trust in his former business partner, but that alone is not enough to establish a fiduciary relationship. Therefore, this claim will be dismissed with prejudice, as the defect is uncurable. Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

VII.   Constructive Fraud

Mathews brings a constructive fraud claim against all Defendants. (Dkt. # 1 at 15.) Under Texas law, constructive fraud involves "the breach of some legal or equitable duty which...the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." Archer v. Griffith, 390 S.W.2d 735, 740 (Tex. 1964); Spear Mktg., Inc. v. BancorpSouth Bank, No. 3:12-CV-3583-B, 2013 WL 3297593, at *8 (N.D. Tex. July 1, 2013). The existence of a fiduciary duty or confidential relationship is requisite to a finding of constructive fraud. Strobach v. WesTex Cmty. Credit Union, 621 S.W.3d 856 (Tex. App.—El Paso 2021, pet. denied). For the reasons stated in Section VI, Mathews failed to allege a fiduciary duty or an informal fiduciary/confidential relationship. Therefore, the constructive fraud claim will also be dismissed with prejudice.

VIII.   Unjust Enrichment against Senoff and Patel

In Count II, Mathews alleges that Patel and Senoff were unjustly enriched when they received additional cash and value in their equity by failing to sell Mailshake for fair market value.  (Dkt. # 1 at 11.)  Defendant argues that the existence of an enforceable contract is fatal to Mathews's unjust enrichment claim. (Dkt. # 6 at 11.)  Mathews responds that the Agreement is unenforceable due to fraudulent inducement, and therefore, there is no enforceable contract.  (Dkt. # 9 at 17.)

Unjust enrichment claims are quasi-contract claims.  Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 683 (Tex. 2000).  An affirmative defense exists against an unjust enrichment claim when a valid, express contract covers the subject matter of the parties' dispute.  Id.; See also Protocol Techs., Inc. v. J.B. Grand Canyon Dairy, L.P., 406 S.W.3d 609 (Tex. App.—Eastland 2013, no pet.)

While the evidence may show that a valid, express contract covers the subject matter of this dispute, Mathews is permitted to plead in the alternative under Rule 8.  FED. R. CIV. P. 8(a), (e)(2); WHC Franchise Corp. v. Four JS Family, LLLP, No. 3:05-CV-0663-B, 2005 WL 8158394, at *1 (N.D. Tex. Nov. 30, 2005) (allowing Mathews to plead breach of contract and unjust enrichment in the alternative).  Therefore, Mathews's unjust enrichment claim should not be

dismissed at this stage just because Mathews states there is a valid, enforceable contract earlier in the Complaint.

However, Defendants also claim that Mathews fails to state a claim for unjust enrichment because Mathews waived his right to recission of the contract.  However, Defendant does not cite a case that states that a plaintiff is required to seek recission as a remedy to an unjust enrichment claim.  Instead, Defendant cites a case where the plaintiff waived its ability to seek recission.  See Webb Materials, Inc. v. Lacey, 364 S.W.2d 473, 474  (Tex. App.—San Antonio 1963, writ ref'd n.r.e.) (affirming trial court's denial of plaintiff's "prayer of recission").  Mathews never indicated he is seeking recission of the contract. Therefore, even if Mathews did waive his right to recission, this waiver does not preclude Mathews's unjust enrichment claim.  As a result, the unjust enrichment claim will not be dismissed at this stage.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss shall be **GRANTED IN PART and DENIED IN PART.**  Plaintiff Colin Mathews's actual fraudulent transfer claim and constructive fraudulent transfer claims shall be **dismissed without prejudice.**  Mathews has until July 22, 2024 to amend its claims.

Mathews's constructive fraud, breach of fiduciary duty, and breach of duty of good faith and fair dealing **shall be dismissed with prejudice.**

Mathews's breach of contract, unjust enrichment, and fraudulent inducement claims shall survive.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, June 20, 2024

_____

David Alan Ezra
Senior United States District Judge